NELLIE MOREHEAD HANNAN CROFT and LILLIE M. HARBOLT, Appellants, v. REUBEN H. MOREHEAD.—293 S. W. 405.

Division One, April 11, 1927.

**1. CONVEYANCES: In Accordance with Prior Will: Mental Capacity of Grantor: Deference to Chancellor.** Where there is positive testimony that at the time an aged father deeded property to his son as a gift he was mentally incapacitated, and equally strong testimony that he was capable of making a contract, the contradictory testimony being by numerous witnesses for each side and mostly oral, the deeds being in exact accord with a will devising the same property to the son, made six years previously and at a time when it is admitted he possessed testamentary capacity, deference will be accorded on appeal to the trial chancellor, who heard the oral testimony of the witnesses, and found that the grantor was not mentally incapacitated to make the deeds.

**2. ———: Undue Influence: Deeds from Father to Son: Aided and Abetted by Grantor's and Grantee's Wives: Inference.** There being no direct or

positive evidence tending to show undue influence, unless it can be inferred or presumed from the fact that the grantor and grantee, an aged father and son, resided in contiguous houses on the tract conveyed, and from the fact that the grantee and his wife waited upon and nursed the grantor during a long illness, which was subsequent to the execution of the deeds conveying said tract, the deeds cannot be set aside on the ground of undue influence on the part of the son, or of his wife, or of the grantor's wife, who was the step-mother of the grantee and the mother of his wife. And there being no evidence of a fiduciary relation between the father and son, or that the father had entrusted his business and financial transactions exclusively or largely to the son, or to the son's wife or to her mother, and the son's wife not being present when the deeds were made, no inference of undue influence can be drawn from the fact that the son and the grantor's wife were present when the deeds of gift were made and delivered; nor can undue influence be inferred from the fact that defendant's wife and her mother did not testify, although the petition charged that he was aided and abetted by them in procuring the deeds.

**3. Conveyances: Voluntary: Right to Attack: Gift of Notes by Insolvent Decedent: Judgment Creditor.** An allowance by the probate court of the amount of deceased's notes, wherein they were contested on the ground that they were gifts by him to the payee, is a judgment against his estate, and the judgment creditor can maintain a suit to have voluntary deeds set aside on the ground that they rendered him insolvent and delayed and defeated the payment of such allowed demands.

**4. ———: ———: Insolvency: Suit by Judgment Creditors.** Although the deceased had no fraudulent intent in conveying his property to his son without consideration, the deeds were invalid as to existing creditors, regardless of his motives in making them, if by their execution and delivery he so far stripped himself of property as to make the remainder retained by him insufficient, at the time, for the payment of the lawful demands of all his creditors. And creditors who have reduced their claims to final judgments, either by allowances in the probate court or on appeal in the circuit court, have a right to maintain suits in equity to set aside the voluntary conveyances, since their necessary effect was to hinder and delay them in the collection of their claims.

**5. ———: ———: ———: Homestead of Deceased: Later Death of Widow.** Where one tract of the two voluntarily conveyed by the father to his son was a homestead, and the grantor's widow was living at the time of the trial, but has since died, and thereby the homestead has apparently become extinct, and the facts demonstrate that the voluntary conveyances should be set aside in the suit of plaintiffs, who are judgment creditors of the deceased grantor's estate, the judgment for the defendant grantee will on appeal be reversed, and the cause remanded with directions to the trial court to enter judgment for plaintiffs and in doing so to make such further inquiry as is necessary to properly enforce the rights of the parties.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2868, p. 898, n. 86. **Deeds,** 18 C. J., Section 504, p. 424, n. 18; Section 513, p. 428, n. 67; Section 551, p. 443, n. 19; Section 552, p. 445, n. 34. **Executors and Administrators,** 24 C. J., Section 1063, p. 382, n. 87. **Fraudulent Conveyances,** 27 C. J., Section 164, p. 500, n. 32; Section 579, p. 727, n. 53.

Appeal from Sullivan Circuit Court.—*Hon. J. E. Montgomery,* Judge.

REVERSED AND REMANDED (*with directions*).

*D. M. Wilson* for appellants.

(1) Creditors who have reduced their claims to judgment have the right to bring a suit in equity to set aside conveyances on the ground of fraud. Brown v. McKeown, 265 Mo. 320; Bank v. Ankrum, 191 Mo. App. 251. (2) They also have the right to bring such a suit where the grantor was mentally incapable to make the conveyance, or was unduly influenced. (3) The failure of the defendant to have his wife and step-mother to testify, either in person or by deposition, is strongly against him and should be taken into consideration. Kame v. Railroad, 254 Mo. 175; Schooler v. Schooler, 258 Mo. 83; McClanahan v. Railroad, 147 Mo. App. 486. (4) Nora Morehead, the defendant's wife, was a competent witness. Laws 1921, p. 392. (5) While disposed to defer in a large measure to the findings of the circuit court, the Supreme Court will assert its right to review the whole evidence, and draw its own conclusions therefrom. Bank v. Fry, 216 Mo. 446. (6) One may be capable of making a will, and yet incapable of making a contract. Martin v. Baker, 135 Mo. 503; Ennis v. Burnham, 159 Mo. 518; Heinbach v. Heinbach, 262 Mo. 69. (7) The evidence shows that the deeds were voluntary. (8) A voluntary conveyance by an insolvent father to his son is fraudulent as to creditors. Childers v. Pickenpaugh, 219 Mo. 376; Bank v. Nichols, 202 Mo. 323. (9) Such conveyances are presumptively fraudulent as to existing creditors, and the burden of proof is on the grantee to establish their validity. Walsh v. Ketcham, 84 Mo. 427; Potter v. McDowell, 31 Mo. 62; Eddy v. Baldwin, 32 Mo. 329; Fehlig v. Busch, 165 Mo. 144; Vandeventer v. Goss, 116 Mo. App. 316; Miller v. Allen, 192 S. W. 967. (10) The allowance of a demand by a probate court is a judgment of a court of record, and is declared by statute to have all the force and effect of a judgment. Sec. 189, R. S. 1919. (11) By the same section these courts are given jurisdiction over all off-sets and other defenses allowed by law. Sec. 189, R. S. 1919. (12) An executor or administrator shall have power to exhibit the same off-sets and other defenses against any suit or other proceeding instituted against the estate of his testator or intestate which he might have made in his lifetime. Sec. 191, R. S. 1919. (13) Where the merits of a controversy have been passed upon by a court of competent jurisdiction, they become *res adjudicata,* and not open to inquiry between the same parties or their privies in any other suit unless the judgment was procured by fraud, or an appeal duly taken. Spradling v. Conway, 51 Mo. 51; Jamison v. Wickham, 67 Mo. App. 575; Smith v. Sims, 77 Mo. 269. (14) The allowance of a claim by the probate court is a judgment of a court of record, and has all the force and effect of a judgment of a circuit court. Cooper v. Duncan, 20 Mo. App. 355; Munday v. Leeper, 120

Mo. App. 417; Smith v. Sims, supra. (15) The character and finality of *res adjudicata* attaches to allowances of the probate court to the same extent they do to judgments of other courts. Whitecloud Milling Co. v. Thomson, 264 Mo. 595. (16) A judgment of a court of record unappealed from, cannot be attacked collaterally, even on the ground of fraud. Abington v. Townsend, 271 Mo. 602. (17) The evidence in this case shows conclusively as far as the demand and judgment of Mrs. Croft is concerned that her notes were based on a valuable consideration, viz: the corner property which had been deeded to her and in which she was living; and as far as Mrs. Harbolt's demand and judgment is concerned the presumption is very great that her note was based also on a valuable consideration, two juries, one in probate court and the other in the circuit court having found in her favor, it appearing from Reuben Morehead's own testimony that he considered the note was given without consideration, and had employed counsel and fought the case in both courts.

*A. G. Knight, R. E. Ash, P. M. Marr* and *John H. Taylor* for respondent.

(1) There was no sufficient evidence of mental incapacity, but substantial evidence of business ability and capacity to transact business. The attorney for appellant transacted business with deceased and received payment therefor. (2) The judge of the circuit court heard the evidence and had the opportunity to pass upon the demeanor of the several witnesses and their interest in the trial, and the Supreme Court will defer to his findings if there is any evidence upon which to base them. (3) The evidence does not sustain appellants' contention of fraud and insolvency at the time of making the deeds.

LINDSAY, C.—After the first hearing of this cause upon appeal, three of the Judges of this Division concurred in an opinion prepared by my associate, Commissioner SEDDON. One of the judges was absent. A rehearing was granted; the cause was argued orally by counsel on both sides; and there was filed on behalf of plaintiffs an additional abstract and brief.

The plaintiffs are the daughters of William Morehead, deceased, and are judgment creditors of his estate. The controlling question is the validity of two deeds executed by said William Morehead, and his wife, a little more than one year before his death, to his son, defendant Reuben H. Morehead. Upon a reconsideration of the record, we have reached a different conclusion from that stated in the original opinion as to the rights of the plaintiffs as judgment creditors, but we adhere to the conclusions reached in that opinion, that the deeds in question were not to be avoided, either because of lack of mental capacity on the part of William Morehead, or on the

ground that their execution was due to the exercise upon him of an undue influence on the part of defendant and his wife.

The issues made by the pleadings, the evidence, the conclusions reached upon the issues of mental capacity and undue influence, and the reasons therefor as stated in the original opinion, prepared by SEDDON, C., are adopted as follows:

"This is a suit in equity brought by two judgment creditors of William Morehead, deceased (who purport to sue not only for themselves but for all others of like character), to set aside two deeds to residence properties in the city of Milan, Missouri, made by said William Morehead and his wife, Sarah A. (now deceased), to Reuben H. Morehead, his youngest child. No other creditors appear to have joined or participated in the prosecution of the action. Plaintiffs are daughters of said William Morehead, and are full sisters of defendant. The petition is in the conventional form and alleges three separate grounds for setting the deeds aside; (1) Fraud, in that the conveyances were made without consideration and the transfer of the property from father to son rendered the father insolvent and unable to pay his creditors, and his estate is insolvent and unable to pay the demands legally allowed against it; (2) mental incapacity of the father; and (3) undue influence exerted over the father by the defendant son, aided and abetted by the defendant's wife, Nora, and her mother, Sarah A. Morehead, the wife of William Morehead and stepmother of the defendant.

"The answer admits that William Morehead died testate on February 4, 1920; that his executor duly qualified and the estate is in process of administration; admits the execution and delivery of the two deeds in question and their due recording in the proper recorder's office, and denies every other allegation of the petition. By way of defense, the answer alleges that the deeds were made and delivered in part consideration of an oral agreement between father and son that defendant would render to the father and his wife, Sarah A., during their lives, any attention, care, assistance and support they or either of them might need; that said oral agreement was fully performed by defendant; that the father, on April 10, 1912, made a will, in which testator states that he has theretofore made provision for all his children, except defendant, and the said will purports to be pleaded *in haec verba,* the ninth paragraph thereof devising the real property in controversy to the defendant; that the father had abundantly provided for all of his other children and that it had long been his express will and desire that the property in question should vest in defendant; that, since the execution and delivery of said deeds, defendant has expended $2,000 in improvements thereon and in payment of taxes and insurance; that, at the time of the conveyances, the father was perfectly acquainted with his

316 Mo.—77.

financial condition and that said conveyances were made for an honest purpose and with due regard for the rights of all the father's children and creditors; that said property was the homestead of William Morehead and his wife, Sarah A., and had been for several years prior to said conveyances; and that plaintiffs have a complete and adequate remedy at law, if they have any cause of action at all.

"The reply admits the making of the father's will, but denies the correctness of same as alleged and set out in the answer; alleges that, by the making of the two deeds in controversy, due regard was not had by the said · William Morehead to the rights of plaintiffs, but that, by the making of said deeds and other certain bills of sale thereafter by said William Morehead to defendant and his mother-in-law, Sarah A. Morehead, all of which were voluntary and without consideration and in fraud of the rights of plaintiffs and other creditors, the father was rendered insolvent and his creditors were thereby hindered and delayed in the collection of their debts; that, before the making of said deeds, defendant and his wife had obtained from the father large sums of money and the making of the said deeds was brought about by undue influence by them over the enfeebled mind of the father, they knowing that his property would not be sufficient to pay his creditors in full and that the legacies in said will to defendant and his mother-in-law would fail and be of no effect; that defendant did not assist, care for, maintain and support his father and wife, but on the contrary that the father not only paid defendant and his wife for the board of himself and wife, but in addition thereto, from time to time, advanced to defendant and wife a large amount of money, and that whenever improvements were made on said properties after the making of said deeds were paid for with the money of the father, and that defendant failed and refused to pay the taxes on said properties or to keep them insured, although receiving and using the rents and profits thereof. The action, being one in equity, was tried and submitted to the chancellor *nisi* without the aid of a jury.

"The evidence shows that William Morehead was thrice married. Of the first marriage but one child survived, a son, John H. Morehead. Of the second marriage, seven children survived, all living, five sons, Addison, James R., William, Jesse T., and defendant Reuben Morehead, and two daughters, the plaintiffs, Nellie Hannan Croft and Lillie M. Harbolt. The father's second wife died in 1908, and in 1909 he married one Sarah A. Payne, a widow, with one child, Nora, who thereafter became the wife of defendant. Plaintiffs offered to prove that defendant's wife, Nora, had been married four times previously to her marriage to defendant, and that defendant married her when he was twenty years of age and when she was thirty-five years of age, which offer the trial court refused because of

immateriality. At any rate, it does appear that defendant is sixteen years younger than his wife, he being twenty-six years of age at the time of the trial and she being then forty-two years of age; that defendant married when he had not quite reached his majority, and that Sarah A. Morehead, the third wife of the father, William Morehead, is the mother of defendant's wife and the step-mother of defendant. The defendant, Reuben H. Morehead, is the youngest child of William Morehead. No child was born of the third and last marriage. The father, William Morehead, had lived upon a farm in Sullivan County for many years. After the death of his second wife, the mother of the parties to this action, he moved to Milan in March, 1909, purchased the properties in question as a homestead and married the third wife, Sarah A., in December of that year.

"When William Morehead moved to Milan he was generally reputed to be worth about $40,000 in land, moneys and promissory notes. In 1894, the father gave to John H. Morehead, the oldest son, born of the first marriage, 120 acres of land, which the son sold in 1916 for $60 an acre. In 1895, the father gave to Addison, the second eldest son, 120 acres of land in Sullivan County. In 1902, he gave to the third oldest son, James, $7,200, of which money the son has had the use for over twenty-one years. In 1908, he gave to the fourth oldest son, William, 160 acres of land, which was sold to his brothers, John and Addison, for $45 an acre, and, with the proceeds from that sale, he purchased a farm of 172 acres. In 1909, he gave to the fifth oldest son, Jesse, a note for $7,000, which note was negotiated and paid before the father's death. The oldest son, John Morehead, testified, in behalf of plaintiffs, that his father 'told me he gave Lillie (the plaintiff, Lillie M. Harbolt) a piece of property in Green City, residence property, value about $4,000. No other property that I know of. Lillie was married in 1903. She lived at home up to that time. I believe it was in 1905 or 1906 that he gave her this property in Green City after she married. I think he gave her that for a home. She didn't have any property up to the time she was married. I understood he gave her a note. I couldn't remember when it was given. She had no property in 1910 that I know of. If he gave her a note, it was a gift. I am telling what my father told me. I talked to him about all these children's gifts. It seems as though he generally wanted to tell me about what he would do. He told me all about it. I suppose he told the rest of the children likewise. I don't believe he told me what he was going to give Reuben (defendant). About all he ever said was he intended for Reuben to have as much as he had given the other children. I don't believe he said how much that was. He said he always wanted them to share and share alike. He has told me that often. In fact he always had talked that way to me. He told

me he wanted his children to be treated equally. I think he intended to give him as much. He wanted to treat them the same.'

"With reference to the gift to the daughter, Nellie (plaintiff, Nellie Croft), John Morehead testified: 'In December of that year (1909), my father married again; a widow lady of Kentucky. They came back in probably two weeks. Before this marriage, he told me that he was going to, or had, deeded the corner property (part of the land in controversy) to Nellie. He gave her two notes if she would turn the property back to him. The deed had not been recorded. She gave the deed back to him, and he gave her the two notes. She was born in 1892, was five years older than Reuben. She lived at home at that time, and was living at home at the time he was talking of giving her the home property. I wasn't present when they had that talk, nor present at any time nor present at any talk between him and his daughter. She had no property at that time, so it was merely a gift. She had no property.'

"The deposition of plaintiff, Nellie Croft, was read in evidence, wherein she testified: 'I can tell the history of the transfer of these properties (in controversy) since 1908. In 1908 the properties were in the name of William Morehead. The home place where my father lived was first deeded to me, and then to Reuben and his wife. My father asked for the deed he had made to me back; and said he would give a note for $2,000 drawing eight percent interest. I had never recorded the deed. The note was given to me in 1910. In other words, the deed from my father to me was never recorded, and I merely handed the deed back to him. The deeds from my father to my brother Reuben and wife were made December 31, 1918, and January 2, 1919. My father left a will at the time of his death. He willed the two pieces of property to my brother Reuben and wife. That was prior to the deeds. Q. Do you know whether or not your brother Reuben and his wife, Nora, knew of the two $2,000 notes owing from your father to you? A. Yes. Q. How do you know that Nora and Reuben knew your father made a will? A. Nora told me. Q. She told you that she and her husband, Reuben, knew of the provisions in your father's will? A. Yes. Q. What was this conversation? A. She told me that papa had made his will and had appointed my brother Add as my trustee, and that I would not get anything only what he wanted me to have. Q. Did she mention that the money spoken of was included in the two notes? A. Yes, sir. I did not know of the provisions in my father's will prior to the conversation with Nora and Reuben. (Much of this conversation between deponent and defendant's wife, Nora, was rejected by the trial court on the ground that defendant was not present during the conversation and it was not binding upon defendant.) I am positive that Nora and Reuben knew of these two notes and

the provisions in my father's will. With reference thereto, before my father deeded these two properties in 1918 and 1919, I had other conversations with Nora and her husband, Reuben, before December, 1917. I told them of my notes, that I held two notes of $2,000 each. Reuben said he wondered if he had any. My step-mother knew of the notes. She learned in 1915. Some time prior to 1912, my father gave me two promissory notes of $2,000 each, one drawing eight per cent interest. I claim positively that Reuben and his wife, Nora, knew of the two promissory notes and knew that my father's will provided for the payment of them, and that subsequent and before my father's death he deeded to Reuben and Nora this same property.'

"Plaintiffs put in evidence the two warranty deeds in controversy. The first deed is a general warranty deed in usual form, dated and acknowledged before John W. Bingham, notary public, on December 31, 1918, filed for record on December 31, 1918, at 4:10 P. M., executed by William Morehead and S. A. Morehead, his wife, as grantors, to Reuben H. Morehead, as grantee, conveying two tracts of land by metes and bounds and including approximately the north half of the land in controversy, for an expressed consideration of $2,000. The second deed is a general warranty deed in usual form, dated and acknowledged before John W. Bingham, notary public, on January 2, 1919, filed for record on January 2, 1919, at 4:15 P. M., executed by William Morehead and S. A. Morehead, his wife, as grantors, to Reuben H. Morehead, as grantee, conveying one tract of land by metes and bounds and including all the lands in controversy, except a tract 65 feet by 320 feet in the northeast corner (which was includ-ed, however, in the first deed), 'subject to the right of S. A. More-head, wife of William Morehead, using, occupying and enjoying the right to the possession and occupancy of said described property for and during the rest of her natural life,' for an expressed considera-tion of $3,000.

"The defendant, Reuben H. Morehead, was called as a witness by plaintiffs, and testified regarding the execution and delivery of the deeds: 'Although the deed of December 31 1918, shows an express consideration of $2,000, there wasn't, in point of fact, any considera-tion paid by me, only when my father gave me the deed, I told him I would take care of him the rest of his life. There was no money consideration paid at all. The deed of January 2, 1919, shows an express consideration of $3,000. In point of fact, there was no con-sideration for that deed, nor any money paid. On January 16, 1919, my father made a bill of sale to me of a car, a Buick automobile. That bill of sale recites the consideration of $500. In point of fact, I didn't pay anything for this car, any part of the $500, but I had a conversation with him when he gave me this bill of sale. He said he wanted to give it to me. One of these deeds was made to me the

31st of December, 1918, and the second one on the 2d day of January, 1919. John W. Bingham, an attorney at law at this bar, made the deeds. I knew him. My father sent for Mr. Bingham. My father had a talk with him. He said he wanted to give me deeds to these two properties. He said he wanted me to take care of him the rest of his life, him and his wife. At the time he made these deeds, I had a conversation with him, or contract or agreement with him, or talk with him about my supporting him. He told me he wanted to give me the deeds to those two properties, the one I was living in and the one on the corner that he was living in. The ones described in these deeds. He told me he was going to make these deeds. Not deed, but deeds, deeds to the two properties. He said he wanted to give me those two properties so I could be made equal with the other children, and he wanted me to take care of him and his wife. He called Mr. Bingham down, and he made the deeds. Bingham's office was over the First National Bank, in Milan. He and I and his wife were present when I had this talk with him. It was right after dinner on the day the deeds were made. Bingham came down in just a short time. He didn't telephone Bingham, but his wife did. Bingham had two blank deeds when he came down. I remained while the deeds were written out. I had nothing to say to Mr. Bingham. My father told Bingham what he wanted. He wrote the deeds there. They were written with a pen. The unprinted portion in the deed of December 31, 1918, is filled out in pen and ink. I know who did that. Mr. Bingham, at the house that day. The unprinted portion of the other deed is filled in in typewriting. That was not done at the house. There were two deeds written with a pen, by Bingham, and when he made the deed to the large house where my father lived, he read it over to my father and my father noticed that it did not reserve his wife's lifetime interest in the place; so he told Bingham to take it back up to his office, and change it. He took it to his office and changed the deed and brought it back, and when he brought it back, it was typewritten. He didn't bring it back the same day. I believe the deeds were written on Saturday, and he brought this back Monday. It was some days later, anyhow. He brought it back the 2nd of January, 1919. He came with it to my father's house. I was there and his wife was there. The deed was delivered to my father and he gave it to me. I don't know what become of the deed, Bingham took back up to his office. I didn't see the deeds or read them while he was writing them, and I never read or saw the deeds until they were delivered to me. The first deed was delivered to me the day it was written. I just kept it. I had it recorded. My wife took it to have it recorded the same day it was written. I gave the other deed to her to have it recorded, because I was working at the shops at that time. Prior to these deeds, he had never given me

any property. I knew what he had given the other children. He gave
Lillie Harbolt (plaintiff) some property in Green City, some horses
and a wagon; some kind of stock and a house and lot in Green City,
and he gave her some money besides. I know about the $4,000 to
Nellie (plaintiff). I know when he gave it; he had given her two
notes for $2,000 each, that was a gift to her the same as the other
gifts to the children. When my father gave me these two proper-
ties, he had bank stock and money in the bank, and he had a lot of
notes in the bank. When he gave Mrs. Hannan (now Nellie Croft,
plaintiff) her notes, she was single; she didn't have any property.
She didn't have $4,000 or any other sum to loan or to advance him
for these notes. They were a gift. Mrs. Harbolt (plaintiff) did not
give my father any property or money. The properties that were
deeded to me ought to be worth $7,000 or $8,000. After these deeds
were made, and I commenced taking care of my father and step-
mother, I made some improvements on the property. The improve-
ments cost me $2,000. I paid the taxes for one year. My lawyers ad-
vised me not to pay them any longer, because they brought this suit.
I was present at the time both the deeds were brought to the house.
The deeds were turned over to me at the house at the time. The deed
made on the 31st of December was delivered to me at the house that
day. The deed on the 31st was delivered to me late in the evening,
and the one on January 2nd was delivered to me about the same
time. On the evening of December 31st, I wasn't there very long,
just a few minutes after the deed was delivered to me. I was there
until it was delivered, and then I departed, and the same on January
2nd. I received the deed on the 31st, about three o'clock, and it was
recorded ten minutes after four. My wife took it up. I had depart-
ed and sent it by her. I don't recollect why the haste of her going
that day. And the next time it was delivered to me about three
o'clock, and I departed shortly afterward, and it was recorded in
the Recorder's office at 4:15. I don't recollect the necessity for the
haste. I was present each time when the deeds were delivered to me,
and each time I departed a very few minutes afterwards. My
father told me he was going to make these deeds. He first told me
that day. That was the first I ever heard of it. It was about noon
he told me, and he immediately called for a lawyer. Bingham
brought two warranty deed blanks. My father told him to bring
two deeds, although the property was contiguous and all together.
Bingham wrote out two deeds the first day, and took one back. I
know why the two deeds were made—because my father wanted me
to have these two places. That is the only reason. He said he wanted
to make me equal with the other children. I didn't hear him in
the telephone conversation with Mr. Bingham. I heard him tell his
wife to call Bingham. She said to Bingham, ''Mr. Morehead wants

you to bring two blank deeds down." That was what she said. Mr. Bingham is dead. I did not talk to my father in the morning the day the deeds were made. On the morning the first deed was made, I and my father did not go to the bank and get the deeds and papers from the bank so as to be advised as to the exact description of the property. I did not. My memory is I never heard of the deeds until that day. I was not in the bank at all with my father on the 31st day of December, 1918. At no time did I go to the Sullivan County Bank and get paper showing the description of these properties. He (father) came from town one day, and told me he wanted me, he said he wanted to be sure I had the deeds. And he wanted me to take care of him and his wife the rest of their days and I told him, "All right, if he felt that way about." So we called a lawyer, Mr. Bingham, and he came down and made one of the deeds to the place where I live. It was late that day, and he had him come down another day and make another. That was the second of January.'

"There appears to be some conflict in the evidence whether the deeds were filed for record by defendant himself or by his wife. Plaintiffs put in evidence the original file book in the Recorder's office, which recites that both deeds were filed by Reuben Morehead and delivered back to him after recording. The Deputy Recorder identified the file book as being in her own handwriting, but admitted that she had no independent recollection aside from the book, but that 'if a man's wife should come in and leave a deed to him, I would not put it to him as bringing the deed. We would say his wife brought it in, in each instance. We never vary from that rule.'

"Plaintiffs offered in evidence the checks drawn on the personal bank account of William Morehead during the years 1918, 1919 and 1920, respectively, in favor of either Reuben or Nora Morehead. Those drawn in the year 1918 aggregated $1466, those in the year 1919 aggregated $1613, and those in the year 1920 aggregated $80, the total for the three years being $3159.97. Most of the checks were drawn semi-monthly for sums of $20 or $25 each and were usually in the handwriting of either Sarah A. or Nora Morehead, and some of them were signed by William Morehead, while others were signed in his name by his wife, Sarah. The defendant admitted that these checks were given to pay for the board of William Morehead and his wife. When asked to explain why he charged his father for board after delivery of the deeds, when part of the consideration therefore he claimed was for care and support of the grantors during their lives, defendant replied, 'I didn't agree to support, I agreed to care for them.' Defendant testified that he and his wife had taken care of his father for two or three years before his death, and that, during the father's several illnesses, defendant's wife nursed him; that the father didn't need much care up to eight or nine months

before he died and didn't become very decrepit until three or four months before his death; that the other children very seldom were with the father and didn't come very much; that they didn't seem to want to see their father; that, before his death, the father had to be waited on in bed at all times and his urine had to be drawn with a catheter, which service defendant's wife performed almost all the time he was sick. There is some corroborative testimony as to the performance of this service of care and nursing by defendant's wife, Nora.

"Plaintiffs put in evidence the record of the Probate Court of Sullivan County showing the allowance of a demand against the estate of William Morehead, deceased, in favor of Nellie Morehead Hannan (now Mrs. Croft, plaintiff herein) on July 23, 1920, for $5215.12. Plaintiffs also put in evidence a judgment of the Circuit Court of Sullivan County, rendered on May 6, 1921, in favor of Lillie Harbolt (plaintiff herein) against the estate of William Morehead for $4850.41. Defendant admitted that he had resisted the allowance of said demands against his father's estate.

"The executor of the father's estate testified for plaintiffs that the inventory and appraisement of the assets of said estate was $11,405; that he had made three settlements, the last showing a balance on hand of $9,573, and since then some assets had been sold at more than their appraised value, making the total assets of the estate at date of trial $9,750. Since that settlement, he had made partial distribution and had paid forty per cent of the judgments and claims entered against the estate; that, after deducting executor's commission, he will have on hand $4,575; that uncollectible and 'no account' assets are estimated at $2,892; that after deducting commissions, attorneys' and probate court fees, there would remain on hand, in the way of available or realizable assets, $1350 to pay the unpaid portion of the allowed claims, amounting to $6700; that the total amount of allowed demands against the estate was a little over $11,000.

"Plaintiffs also put in evidence a detailed estimate of the assets of William Morehead on January 1, 1919, the date of the deeds to defendant, which shows an estimated value of all his property on that date to be $10,918; and also an estimated list of debts owing by William Morehead on the same date, aggregating $10,852; included in this list of debts, however, are the claim of plaintiff, Nellie Hannan Croft, for $6,198 and that of plaintiff Lillie Harbolt for $4,014; aside from these two claims, the estimated indebtedness of William Morehead on January 1, 1919, is only $640.25. Both lists of estimated assets and liabilities were prepared by the executor of the estate. The executor is a nephew of William Morehead, whom he had known all his life. He had been the cashier of the Sullivan County

Bank for sixteen years, and had been connected with the bank for twenty-eight years. William Morehead had been an original stockholder and director of that bank and had served continuously as a director until January, 1919, when another person was elected a director in his stead. He testified that William Morehead kept some of his papers in the bank in a little tin box. 'I remember of his having among his papers a deed to what is known as the Edinburn property; that is the east piece of the property of the Morehead tract, the east one of the two (in controversy) that you have been talking about. I remember of Mr. Morehead, Uncle Bill, as I call him, calling for that paper one morning. Reuben (defendant) was with him. I got the deed for them. That was probably ten o'clock. He said he wanted to get the Edinburn deed and wanted to do a little changing.' He testified that William Morehead had attended the following monthly directors' meetings of the bank during the year 1918, as shown by the minute records of the bank: January, February, July, September and December. Decedent's will was found among his papers in his private box in the bank upon his death.

"Defendant put in evidence the will of William Morehead, subscribed by the testator on April 10, 1912, and attested by Earl F. Nelson, now a prominent attorney in St. Louis, and John W. Bingham, as subscribing witnesses. The relevant items of this will are:

" 'Item 2. I have heretofore given to my son, John H. Morehead, 200 acres of land, so I do not give him anything by this will, except as herein otherwise stipulated. It is also, understood that he, John H. Morehead, now owes and is indebted to my estate in the sum of three hundred dollars.

" 'Item 3. I have, also, heretofore given to my son, Addison Morehead, 200 acres of land, which is to be in full of his interest in my said estate, except as hereinafter otherwise mentioned. It is understood, also, that he, Addison Morehead, now owes and is indebted to my estate in the sum of three hundred dollars.

" 'Item 4. I have heretofore given to my son, James R. Morehead, certain real estate which he has converted into money, which is in full of his share of my estate, except as otherwise stated in the residuary clause of this will.

" 'Item 5. I have likewise given to my son, William Morehead, Jr., 160 acres of land and do not give him anything by this will, except as hereinafter stated.

" 'Item 6. I have given to my daughter, Lillie Harbolt, heretofore certain property out of my estate, which shall be in full of her share in my said estate, except as hereinafter provided for in the residuary clause of this will.

" 'Item 7. I have heretofore given to my son J. T. Morehead my note for the sum of $7,000, on which note there has been paid the

sum of $2,500 and I direct my executor herein to pay the balance due on said note, if any, at the time of my decease and when so paid to be in full of his interest in my said estate.

" 'I further direct that he, the said J. T. Morehead, shall not share in the remainder and residue of my estate as my other children.

" 'Item 8. I give, devise and bequeath to my daughter, Nellie Morehead Hannan, the sum of four thousand dollars which is the amount of two notes now held by N. J. Payne, cashier of the Sullivan County Bank, being the notes I have heretofore given her and upon the payment of the balance due on said notes I request the surrender of said notes to my executor hereinafter appointed. I, also, give and bequeath to her, Nellie Morehead Hannan, the piano now in my possession but purchased by her.

" 'I herein appoint and name my son Addison Morehead, as trustee to accept and receive the amount so remaining due on said two notes at the time of my decease and to hold the same in trust for the use and benefit of the said Nellie until such a time that the said Nellie shall settle down and be ready and willing to properly invest said money and to preserve and take care of the same and when said trustee shall be satisfied that this will be done, then I direct him to pay over the balance in full due the said Nellie under this will. I further direct that should the said Addison Morehead die before the completion of the trust herein provided for that James R. Morehead be appointed and designated to carry out my wishes and desires in this matter.

" 'Item 9. Not having heretofore given to my son, Reuben Morehead, any property of any kind, I give, devise and bequeath to him the following described real estate, lying and being situated in Sullivan County, Missouri, to-wit: (Being the property in controversy).

" 'I will and direct that my beloved wife, Sallie A. Morehead, shall have the right to use and occupy all of said above mentioned real estate jointly with my son, Reuben Morehead, during the rest of her natural life and that on the death of my said wife, Sallie A. Morehead, or on her abandonment of said mentioned real estate, then all of said property shall vest absolutely and in fee in my son, Reuben Morehead. I further give and bequeath to my son, Reuben Morehead, all of my bank stock in the Sullivan County Bank and enough over and above the book value of said stock at the time of my decease to make the sum of five thousand dollars. I further will that my said son, Reuben, shall not share in the rest and residue of my said estate. . . .' "

" 'Item 12. I give, devise and bequeath to my sons and daughters, John H. Morehead, Addison Morehead, James R. Morehead, William Morehead Jr., Lillie Harbolt and Nellie Morehead Hannan

all the rest and residue of my estate, whether real, personal or mixed property and wherever situated to share and share alike.'

"It was shown by the testimony of plaintiffs' own witnesses that the testator was mentally and physically strong and vigorous at the time he executed and published his will.

"The evidence was conflicting as to the mental capacity of William Morehead at the time of the execution and delivery of the deeds in controversy. He had been for many years an active director in the Sullivan County Bank and bore an enviable reputation for his knowledge of the financial standing of those who lived in the community and for his general business sagacity. At the time the deeds were delivered, he was past 81 years of age. The evidence of the executor and decedent's son, James R. Morehead, president of the Sullivan County Bank, was that, at the time the deeds were made and a year or two prior thereto, William Morehead, although quite often attending the directors' meetings, paid no particular attention to the business transacted; that he said nothing, took no part in the deliberations of the board, and seemed to treat things with indifference, so much so that, at the stockholders' meeting in January, 1919, a few days after the delivery of the deeds, it was thought best not to re-elect him as a director. The testimony of the executor and the five sons of decedent, all of whom testified for plaintiffs, tended to show that, in their opinion, he was not mentally capable of transacting business at the time the deeds were made. One of the sons, William Morehead, however, testified that in February or March, 1919, some two or three months after the delivery of the deeds, the father offered to sell him the home place (in controversy) for $6,000. He testified: 'I hadn't learned then that the deeds were made. I told him I would try to buy it of him if I sold my farm. I thought it was all right to buy it from him. I wouldn't want to trade with a man that was insane. I believe he was in a condition to make that trade with me that day. I don't believe I said that my father was insane. I won't say that.' The plaintiff's daughter, Lillie Harbolt, did not testify at the trial, but the deposition of the co-plaintiff, Nellie Croft, was read in evidence in which she stated her opinion that her father's mind was impaired and he was not mentally capable of making the deeds. Several friends and acquaintances of the father testified for plaintiffs that, during the last few years of his life, he was forgetful, could not remember names or faces of acquaintances, did not seem to comprehend simple business transactions, occasionally lost his way about town and would inquire as to directions, and sometimes gesticulated with his hands and laughed aloud without apparent reason. One of the sons testified that, on one occasion, his father mistook him for another son and asked the names of some of his own children.

"On the other hand, defendant positively testified that his father was strong and vigorous mentally and able and capable of taking care of and transacting his business affairs until the time of his death, which occurred on February 4, 1920, more than a year after the execution of the deeds, although for several months prior to his death he was confined, at least part of that time, to bed. It was shown that the father was deaf and had been for some years, by reason whereof he had formed the habit of gesticulating with his hands when in conversation. His family physician and some five or six old-time acquaintances testified that he was strong mentally for a man of his age. The cashier of the First National Bank of Milan testified to a business transaction had with deceased on or shortly prior to December 30, 1918, concerning the renewal of a note on which deceased was an endorser, and that deceased appeared to understand and comprehend this business transaction. There was no direct or concrete evidence tending to show undue influence over deceased by defendant, his wife or mother-in-law, other than the family relationship existing between them and the fact that the son and father resided in contiguous dwellings upon the land in controversy. Neither of the plaintiffs was personally present at the trial, nor were defendant's wife and mother-in-law present, nor was testimony of the latter taken by deposition or offered at the trial. Defendant testified that his wife and mother-in-law (his step-mother) were temporarily living in Nebraska, "just camping out there," at the time of the trial. Evidence was adduced by plaintiffs that the lands in controversy are worth from $10,000 to $14,000 in value.

"Immediately upon the conclusion of the trial, the chancellor *nisi* entered a decree finding the issues for defendant and dismissing plaintiffs' bill with judgment for costs. After unsuccessfully seeking a new trial, plaintiffs appeal to this court.

"I. Respecting the issue of mental incapacity of the father to make and deliver the deeds in controversy, the testimony was sharply conflicting. While all of deceased's sons, except defendant, testified in behalf of plaintiffs that he was not mentally capable of making the deeds, yet one of the sons, when pressed on cross-examination to say unequivocally whether his father was insane at the time, replied, "I don't believe I said that my father was insane. I won't say that." Defendant, having had occasion to observe the father more closely than any of the other children, who, according to defendant's testimony, seldom visited him and therefore had slight opportunity to judge of his mental capacity, just as positively testified that his mentality was unimpaired. In this testimony, he is corroborated, not only by the attending family physician, but by several old friends and acquaintances of the father, including an official of a local bank who had a

**Mental Incapacity.**

business transaction with deceased about the time of the execution and delivery of the deeds. All of the children seem to agree in their testimony that the father was mentally vigorous and competent at the time he made and published his will on April 10, 1912. We are aware of cases holding that one may be capable of making a will and yet mentally incapable of making a deed or contract. However, in this instance, the execution and delivery of the deeds in controversy to the defendant son but carries out the identical idea and intention expressed by the testator in his will, namely, that having made provision for all his other children and none for defendant, the properties in controversy were to go to the defendant son, subject to the life estate of deceased's widow. There is nothing in the record before us to indicate that the father had experienced a 'change of heart' during the interim between the execution of the will and the making and delivery of the deeds, for even the plaintiffs' witnesses admit that all the other children had been provided for in some manner and to some extent by the father, and that he had repeatedly expressed to his children his intention and purpose that all should share in his bounty substantially alike. While it is our duty, in cases of this kind and nature, to weigh the evidence in the record before us and reach our own conclusions as to the final result, we must at the same time accord due deference to the conclusions and findings of the trial chancellor. He oftimes knows the parties and witnesses personally, has the opportunity to hear the testimony from their own lips, to observe their demeanor upon the stand, and to judge of the credibility and consequent weight of the testimony far better than ourselves, who have not the benefit of these aids and must arrive at a conclusion from impressions gained from a reading of the printed, and sometimes unexpressionless, page. [Bartlett v. White, 272 S. W. l. c. 954; Huffman v. Huffman, 217 Mo. l. c. 191; Cook v. Higgins, 290 Mo. l. c. 432.] Allowing due deference to the conclusions of the trial chancellor, and giving to the testimony the weight which our own judgment accords thereto, we find no reason or occasion to disturb the finding and conclusion of the court *nisi* on the issue of deceased's mental incapacity.

"II. Respecting the issue of undue influence of the defendant, his wife and step-mother over the mind of the father at the time of the making of the deeds, as we have heretofore remarked, there

**Undue Influence.** is no direct or positive evidence tending to show such undue influence, unless it may be inferred or presumed from the mere fact of family relationship and that father and defendant son resided in contiguous homes upon the tract of land in controversy and from the further fact that defendant and his wife waited upon and nursed the father during his ill-

ness which appears from the record, however, to have been subsequent to the making and delivery of the deeds. It is not shown that any fiduciary relation existed between father and son, or that the father had given over or entrusted his business and financial transactions exclusively or largely to the management and direction of his son, daughter-in-law or his own wife. The testimony does not show that defendant's wife was present when the deeds were made and delivered, and while it is shown that defendant and his step-mother were both present, yet they were parties to the deeds and their presence was necessarily required for the proper execution, acknowledgement and delivery of the deeds.

"In Huffman v. Huffman, 217 Mo. l. c. 193, we said: 'It is not every case in which an aged, sick and infirm parent who is under the ministering care of a son or daughter that raises such a presumption of undue influence as would justify the setting aside of a deed or will in the child's favor.' To the same effect are Bonsal v. Randall, 192 Mo. l. c. 531; Maddox v. Maddox, 114 Mo. l. c. 48, and Bartlett v. White, 272 S. W. 954.

"There being no presumption of undue influence arising by reason of proof of a fiduciary relation between father and son in the instant case, we are constrained to hold that the burden was upon plaintiffs to prove undue influence and they have failed to sustain the burden of proof on that issue. Nor is our conclusion on this issue affected by the failure of defendant to produce his wife and stepmother as witnesses in his own behalf. While it is argued by appellants that, inasmuch as the petition charges that defendant was aided and abetted by his wife and stepmother in procuring said deeds, the failure of defendant to have his wife and step-mother testify, either in person or by deposition, is to be taken strongly against him and given due consideration by this court on appeal; nevertheless, plaintiffs offered no proof of undue influence or fiduciary relation and therefore defendant was not called upon to offer any testimony combating that issue."

IV. Proceeding then upon the basis that the deeds in question were not voidable for lack of mental capacity of the maker, nor because procured to be executed by the exercise of undue **Voluntary Conveyance: Right of Judgment Creditor.** influence upon the part of defendant, there remains the question whether they are to be avoided upon the ground that they were voluntary conveyances and their making rendered William Morehead insolvent, and thereby the transaction was a fraud upon the rights of the plaintiffs as creditors.

Upon rehearing, the question most considered was the right of the plaintiffs to attack the validity of those deeds. There are statements

in the testimony of the defendant that the notes executed by William Morehead and allowed against his estate, were gifts; that he was in no way indebted to them at the time the notes were given, and that they were merely voluntarily promises made by him. One note to plaintiff Nellie Morehead Hannan Croft was executed November 20, 1909, the other February 28, 1910; and the note to Lillie Harbolt was executed June 14, 1914. The evidence shows that before his last marriage, William Morehead executed and delivered to plaintiff Nellie Croft a deed of conveyance of one of the properties herein involved, spoken of as to the corner property, but that she did not cause said deed to be recorded. Some months afterward, and near the time of his last marriage, William Morehead requested that she deliver this deed back to him, and accept his note in lieu thereof. She returned the deed to him, and he executed and delivered to her the two notes, afterward allowed as demands against his estate. The notes thus given to her took the place of a gift which had been fully executed, and were made upon the consideration mentioned. There is not much in the record to show the circumstances under which the note to plaintiff Lillie Harbolt was executed. However, the record shows that the allowance of these notes as demands against the estate was resisted by the executor, actively aided in that regard by the defendant. The judgment in favor of plaintiff Nellie Croft was entered upon the verdict of a jury. No appeal was taken therefrom. The allowance to plaintiff Lillie Harbolt in the probate court was also entered upon the verdict of a jury. An appeal was taken by the executor, and upon a trial in the circuit court she again had judgment, entered upon the verdict of a jury, under instructions given by the circuit court. These judgments became and were final.

The probate court had full jurisdiction to hear and allow the demands. The executor was authorized to exhibit any offset or other defense which the testator might have made in his life time, including the defense of want of consideration. There is oral testimony tending to show that such defense was made. The allowances had the full force and effect of judgments. [Secs. 189, 191, R. S. 1919.] The validity of these judgments is not assailed in the answer herein. They establish the status of plaintiffs as creditors, and are a bar to any claim, if such had been made in the answer, that the notes were executed voluntarily, and without consideration. [Smith v. Sims, 77 Mo. 269; Greenabaum v. Elliott, 60 Mo. 25; Johnson v. Beazley, 65 Mo. 250.]

The evidence shows that the conveyances to defendant were voluntary. The defendant testified that no consideration was paid for either of the properties. He made claim that he had promised to support and care for his father and step-mother. The deeds themselves contain no condition of that kind. There is no claim that

defendant expended anything in the care of his father; but the evidence shows the living expenses of William Morehead and his wife were borne by William Morehead. Checks introduced in evidence, given by William Morehead, to defendant or to his wife Nora Morehead, in the period between the execution of the deeds and the death of William Morehead, about thirteen months, aggregate $1,693. The like checks given in the year 1918, the year preceding the making of the deeds, aggregated $1,466.97. When asked to explain why he charged his father for board, after delivery of the deeds, when part of the consideration therefor was to be the care and support of the grantors during their lives, defendant replied, "I didn't agree to support, I agreed to care for them." There are two residence properties involved. William Morehead and his wife lived in the property spoken of as the corner property, and defendant and his wife in the property adjoining it on the east, and William Morehead and his wife boarded at the home of defendant. Checks were drawn semi-monthly for board, at $40 per month. The total of the checks is far in excess of the amount charged for board.

The aggregate amount of the allowed claims of plaintiffs, at the time of allowance, was $10,065. The amount of the inventory and appraisement of the assets of the estate was shown and the amount of the demands allowed. The inventory and appraisement of the assets aggregated $11,405. The amount of allowed demands, which included the demands of the plaintiffs, was somewhat in excess of $12,000. The executor of the estate was, and for many years had been, cashier of the bank of which William Morehead had for a long time been a director and was familiar with the affairs of the deceased. He testified that he had made three settlements, the last showing a balance of $9,573; that since then some assets (bank stock) had been sold for $177 more than the appraised value, raising the total to $9,750; that since that settlement, and the showing of that balance, he had made a partial distribution among creditors, and had paid 40 per cent of the claims entered against the estate; that after deducting the executor's commission, he would have on hand $4,575; that there were assets "no account," or uncollectible, in the amount of $2,892; that after deducting commission, attorneys' fees and costs, there would remain on hand as available, or realizable assets, $1,350 to pay the unpaid portion of the allowed claims amounting to $6,700. He estimated the assets of William Morehead as of January, 1919, at $10,918. This included assets both good and bad. He also gave an estimate and list of the debts due from William Morehead on that date, aggregating $10,852. The estimate of assets of William Morehead of $10,918 as of January 1, 1919, when reduced by the amount of uncollectible notes and assets of no value, left a balance of actual worth at the time, of not much in

excess of $8,000, with liabilities amounting to $10,852. It is plain from the evidence, that the estate of William Morehead falls far short of being equal to the amount of the allowed claims, and plain also that on January 1, 1919, when he conveyed the real estate to defendant by deeds voluntarily made, the property he had left, of value, and available to pay indebtedness then existing against him, was less than the amount of said indebtedness. Of the properties conveyed by him to defendant the corner property was his homestead. The other property was not, at that time, exempt from execution against him.

There is no suggestion that William Morehead had any fraudulent intent in making those conveyances, without consideration. But they must be regarded as invalid as to the plaintiffs, as then existing creditors, regardless of the motives which actuated William Morehead in making those deeds, since, by their execution and delivery, he so far stripped himself of property, as to make the remainder retained by him, insufficient, at that time, for the payment of the then existing demands of the plaintiffs and others. For that reason those conveyances are invalid as against the plaintiffs. [Barrett v. Foote, 187 S. W. l. c. 70; Citizens Bank v. McElvain, 280 Mo. l. c. 513; Childers v. Pickenpaugh, 219 Mo. 376; Bank v. Nichols, 202 Mo. 323.] The plaintiffs having reduced their claims to judgment had the right to bring their suit in equity, to set aside these conveyances as fraudulent in law, since the conveyances were voluntary, and their necessary effect was to hinder and delay the plaintiffs in the collection of their claims. [Brown v. McKown, 265 Mo. 320.] The plaintiffs, on that ground are entitled to the relief asked.

The evidence in the record shows that the widow of William Morehead was living at the time of the trial, but the statement is made in the briefs upon appeal, that she has since died. Our conclusion is that the judgment must be reversed and the cause remanded and judgment entered for the plaintiffs; and in doing so, the trial court may make such inquiry as is necessary to properly enforce the rights of the parties. *Seddon, C.,* concurs.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.